# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SETH KHANER**, on behalf of himself, and all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>**PRUDENTIAL FINANCIAL, INC.** d/b/a **THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**,<br><br>                    Defendant. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Seth Khaner ("Plaintiff"), through his attorneys, individually, and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Prudential Financial, Inc. d/b/a The Prudential Insurance Company of America ("Prudential" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1.    This action arises from Prudential's failure to safeguard sensitive personally identifiable information ("PII") and protected health information ("PHI")—together "PII/PHI" of over 2.5 million people, including Plaintiff and proposed Class Members

2.    Prudential is one of the largest insurance companies in the United States, providing a wide range of insurance products and services. As such, Prudential stores a litany of highly sensitive personal identifiable information ("PII") and protected health information. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected

computer systems in a data breach (the "Data Breach"). ("PHI")—together "PII/PHI"—about its current and former customers (and their beneficiaries).

3.      On February 12, 2024, Prudential disclosed in a Form 8-K filing with the US Securities and Exchange Commission that a threat actor had gained unauthorized access to Prudential's systems. Prudential first believed that the threat actor had accessed Prudential's administrative, user data and a small percentage of employees and contractors' user accounts.[1] Prudential assured the public that data breach was not "material" and that based on its investigation to date, there was no evidence that the threat actor had taken customer or client data.[2]

4.      Nearly two months later, in a filing with the Maine Attorney General's Office, Prudential first disclosed that the threat actor had stolen more than 36,000 individual's information.[3]

5.      However, on July 2, 2024, Prudential revealed that the breach had actually compromised the data of more than 2.5 million individuals.[4]

6.      It is unknown for precisely how long the cybercriminals had access to Defendant's network before the breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former customers' (and their beneficiaries') PII/PHI.

---

[1] *See SEC filings*, Prudential Financial, Inc. Current Report (Form 8-K) (Feb. 12, 2024) available at https://www.sec.gov/Archives/edgar/data/1137774/000119312524033753/ d770643d8k.htm (last accessed July 10, 2024).

[2] *Id.*

[3] *Data Breach Notification*, Office of the Maine Attorney General, available at: https://apps.web.maine.gov/online/aeviewer/ME/40/bcc5d2ac-a40f-4204-89ca-4b665f43c362.shtml (last accessed July 10, 2024).

[4] *Data Breach Notification*, Office of the Maine Attorney General, available at: https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/cc7a25d8-bb55-485b-b3bc-060aa12004dd.html (last accessed July 10, 2024)

7.     On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII/PHI. In short, Defendant's failures placed the Class's PII/PHI in a vulnerable position—rendering them easy targets for cybercriminals.

8.     Plaintiff is a Data Breach victim, having received a breach notice. *See* **Exhibit A**. He brings this class action on behalf of himself, and all others harmed by Defendant's misconduct.

9.     The exposure of one's PII/PHI to cybercriminals is a bell that cannot be unrung. Before this data breach, its current and former customers' (and their beneficiaries') private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

10.     Plaintiff, Seth Khaner, is a natural person and citizen of Ohio. He resides in Miamisburg, Ohio where he intends to remain.

11.     Defendant, Prudential Financial, Inc., d/b/a The Prudential Insurance Company of America, is a profit corporation incorporated in New Jersey with its principal place of business at 751 Broad Street, Newark, New Jersey 07102.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiff and Defendant are citizens of different states. And there are over 100 putative Class members.

13.     This Court has personal jurisdiction over Defendant because it is headquartered in New Jersey, regularly conducts business in New Jersey, and has sufficient minimum contacts in New Jersey.

14.     Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

### Defendant Collected and Stored the PII/PHI of Plaintiff and the Class

15.     Defendant is a major insurance provider, specializing in a wide range of products including individual and group life insurance. Prudential serves millions of clients, managing extensive amounts of sensitive personal and financial information as part of its operations.

16.     In collecting and maintaining the PII/PHI, Defendant was obligated to secure the Private Information from unauthorized disclosures by contract, industry standards, common law, and its representations to its customers, including Plaintiff and other Class Members. Plaintiff and Class Members provided their PII/PHI to Prudential with the understanding that Prudential and would comply with their obligations to keep such information confidential and secure from unauthorized disclosures.

17.     Defendant recognizes these duties, declaring in its "US Consumer Privacy Notice" that:

   a.     "Prudential values your business and your trust."[5]

---

[5] *US Consumer Privacy Notice*, Prudential, https://www.prudential.com/links/privacy-policy (last visited July 7, 2024).

b. "We respect the privacy of your personal information and take our responsibility to protect it seriously."[6]

c. "This privacy notice is provided on behalf of the Prudential companies listed at the end of this notice, except for Assurance IQ, and applies to our current and former customers."[7]

d. "This notice describes how we treat the information we receive about you, including the ways in which we will share your personal information[.]"[8]

e. "We maintain physical, electronic, and procedural safeguards to protect your personal information."[9]

f. "The people who are authorized to have access to your personal information need it to do their jobs, and we require them to keep that information secure and confidential."[10]

g. "Unless you agree otherwise, we do not share your personal information with non-Prudential companies[.]"[11]

18. Likewise, via its "Online Privacy Statement," Defendant promises that:

a. "Prudential collects Social Security numbers in the course of its business activities. Prudential has a privacy policy that is designed to protect personal information, including Social Security numbers. This policy requires that Prudential have measures in place to keep all personal information about its

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

customers and employees, and employees of our vendors and business partners, secure and confidential."[12]

b.  "Prudential retains personal information for as long as needed or permitted in light of the purpose(s) for which it was obtained and consistent with applicable law."[13]

c.  "Prudential seeks to use reasonable administrative, technical and physical safeguards and other security measures to protect personal information within our organization."[14]

19.  Finally, in terms of PHI, Defendant declares in its "HIPAA Notice of Privacy Practices" that:

a.  "This Notice describes the ways in which the Plans may use and disclose your health information (also called 'Protected Health Information')."[15]

b.  "We are required by law to: Ensure that Protected Health Information that identifies you is kept private, except as such information is required or permitted to be disclosed by law. Describe the Plans' legal duties and privacy practices with respect to your Protected Health Information. Abide by the terms of this Notice that are currently in effect. Inform you in the event of a breach of your unsecured Protected Health Information."[16]

---

[12] *Online Privacy Statement*, Prudential, https://www.prudential.com/links/privacy-statement (last visited July 7, 2024).
[13] *Id*.
[14] *Id*.
[15] *HIPAA Notice of Privacy Practices*, Prudential , https://www.prudential.com/links/hipaa (last visited July 7, 2024).
[16] *Id*.

c.      "We must follow the terms of the Notice currently in effect. Our employees, agents and authorized vendors who have access to your Protected Health Information to provide services must also follow this Notice."[17]

d.      "We will not use or share your information other than as described in this Notice unless you tell us we can in writing. We will also comply with any state or federal law that is more restrictive as to our uses and disclosures of Protected Health Information."[18]

20.     In its "Data Security Statement" Defendant stated that:

a.      "Prudential regularly faces cybersecurity threats and attempted attacks, both general and targeted, against our operating environment.  Protecting the data entrusted to us, especially personal data, and protecting our operating environment remain top areas of focus for Prudential."[19]

b.      "Prudential's global information security and privacy programs establish minimum controls and standards around the collection, use, storage and security of personal data, and those programs are staffed by privacy and security professionals and attorneys."[20]

c.      "We continually evaluate and evolve this mix of technologies, process, controls, and threat intelligence to prevent and detect cyber-attacks. The Company has entered into an information security risk insurance policy."[21]

---

[17] *Id*.

[18] *Id*.

[19] *Data Security Statement*, Prudential, available at:
https://www.prudential.com/links/about/data-security-statement (last accessed July 10, 2024)

[20] *Id.*

[21] *Id.*

21.    Notwithstanding its obligations, it is apparent from the reported nature and extent of the Data Breach, and Defendant's response thereto, that Defendant failed to take reasonable, timely and appropriate measures to protect against the foreseeable unauthorized disclosure of Private Information.

***Defendant's Data Breach***

22.    On February 4, 2024, Defendant was hacked in the Data Breach.[22]

23.    In its February 12, 2024 Form 8-K filing with the SEC, Prudential disclosed that

a.    "As of the date of this Report, we believe that the threat actor, who we suspect to be a cybercrime group, accessed Company administrative and user data from certain information technology systems and a small percentage of Company user accounts associated with employees and contractors."[23]

b.    "We do not have any evidence that the threat actor has taken customer or client data."[24]

24.    One week later, notorious ransomware group known as BlackCat and Alphv claim credit for listing Prudential on its Tor-based leak site.[25] Prudential then disclosed that the ransomware group had accessed over 36,00 individuals' data.[26]

---

[22] *SEC filings*, Prudential Financial, Inc. Current Report (Form 8-K) (Feb. 12, 2024) available at https://www.sec.gov/Archives/edgar/data/1137774/000119312524033753/d770643d8k.htm *Data*
[23] *Id.*
[24] *Id.*
[25] SecurityWeek *Prudential Financial Data Breach impacts 36,000*,. Available at: https://www.securityweek.com/36000-impacted-by-prudential-financial-data-breach/ (last accessed: 10 July 2024).
[26] *Data Breach Notification*, Office of the Maine Attorney General, available at: https://apps.web.maine.gov/online/aeviewer/ME/40/bcc5d2ac-a40f-4204-89ca-4b665f43c362.shtml (last accessed July 10, 2024).

25.     In a subsequent filing with the Iowa Attorney General, Defendant has already admitted the following:

      a.     "[A]n unauthorized third party believed to be associated with a cybercrime group obtained access to a Prudential employee's computer account by acquiring log-in credentials through social engineering of Prudential's help desk vendor."[27]

      b.     "The unauthorized third-party subsequently acquired the log-in credentials of other Prudential employees."[28]

      c.     "Prudential identified evidence that the unauthorized third party removed certain customer information."[29]

26.     Just this month, on July 12, 2024, Prudential revised it data breach notice to disclose that over 2.5 million individuals were impacted in the Data Breach.

27.     Because of Defendant's Data Breach, at least the following types of PII/PHI were compromised:

      a.     first and last names;

      b.     dates of birth;

      c.     policy numbers;

      d.     contact information;

      e.     addresses;

      f.     email addresses;

---

[27] *Breach Notice*, Iowa Attorney General (May 22, 2024)
https://www.iowaattorneygeneral.gov/media/cms/5222024_Prudential_Insurance_Compan_F56
EC740138A7.pdf.
[28] *Id*.
[29] *Id*.

g.      phone numbers;

h.      Social Security numbers;

i.      credit card information;

j.      debit card information;

k.      financial account information;

l.      driver's license information;

m.      health treatment information;

n.      health diagnosis information;

o.      prescription information; and

p.      health condition information.[30]

28.    In total, Defendant injured at least 2,556,210 persons—via the exposure of their

PII/PHI—in the Data Breach.[31] Upon information and belief, these 2,556,210 persons include its

current and former customers (and their beneficiaries).

29.    Although Defendant was aware of the breach in February 2024, Defendant waited

until April 2024 to begin notifying a small subset of the Class. Defendant waited until July 2024

before it began notifying the 2.5 million individual who had their information stolen.

30.    Thus, Defendant kept the Class in the dark—thereby depriving the Class of the

opportunity to try and mitigate their injuries in a timely manner.

---

[30] *Data Breach Notice*, Iowa Attorney General (June 28, 2024)
https://www.iowaattorneygeneral.gov/media/cms/6282024_PrudentialInsurance_Compan_ED90
6E8233AB8.pdf.
[31] *Data Breach Notifications*, Maine Attorney General,
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-
a1252b4f8318/cc7a25d8-bb55-485b-b3bc-060aa12004dd.html (last visited July 7, 2024).

31.     Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII/PHI. And thus, Defendant caused widespread injury and monetary damages.

32.     203.     Since the breach, Defendant have promised to "review[] our existing policies and procedures."  But this is too little too late. Simply put, these measures—which Defendants now recognize as necessary—should have been implemented before the Data BreachOn information and belief, Defendant failed to adequately train its employees on reasonable cybersecurity protocols or implement reasonable security measures.

33.     Further, the Notice of Data Breach shows that Defendant cannot—or will not—determine the full scope of the Data Breach, as Defendant has been unable to determine precisely what information was stolen and when.

34.     Defendant has done little to remedy its Data Breach. True, Defendant has offered some victims credit monitoring and identity-related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiff and Class members for the injuries that Defendant inflicted upon them.

35.     Because of Defendant's Data Breach, the sensitive PII/PHI of Plaintiff and Class members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class members.

36.     Stunningly, this Data Breach is only part and parcel of Defendant's *pattern* of negligent data security. Indeed, in 2023, Defendant experienced another data breach which exposed the PII of 320,840 individuals.[32]

37.     Worryingly, the cybercriminals that obtained Plaintiff's and Class members' PII/PHI is the notorious cybercriminal group "ALPHV Blackcat."[33]

38.     ALPHV Blackcat is an especially notorious cybercriminal group. In fact, the Federal Bureau of Investigation (FBI) and the Cybersecurity and Infrastructure Security Agency (CISA) released a joint report warning the public about ALPHV Blackcat.[34] Specifically, the joint "Cybersecurity Advisory" (CSA) stated, *inter alia*, that:

   a.     "ALPHV Blackcat actors released a new version of the malware, and the FBI identified over 1000 victims worldwide targeted via ransomware and/or data extortion."[35]

   b.     "This ALPHV Blackcat update has the capability to encrypt both Windows and Linux devices, and VMWare instances."[36]

   c.     "ALPHV Blackcat affiliates have extensive networks and experience with ransomware and data extortion operations."[37]

---

[32] *Data Breach Notifications*, MAINE ATTY GEN, https://apps.web.maine.gov/online/aeviewer/ME/40/e2a5ab4c-3947-4a2e-a9fe-b58eec80686c.shtml (last visited July 7, 2024).

[33] Pierluigi Paganini, *Prudential Financial Data Breach Impacted Over 2.5 Million Individuals*, SECURITY AFFAIRS (July 2, 2024) https://securityaffairs.com/165121/data-breach/prudential-financial-data-breach-2-5m-individuals.html.

[34] *ALPHV Blackcat*, FBI & CISA (Dec. 19, 2023) https://www.cisa.gov/sites/default/files/2023-12/aa23-353a-stopransomware-alphv-blackcat_0.pdf.

[35] *Id*.

[36] *Id*.

[37] *Id*.

d.   "According to the FBI, as of September 2023, ALPHV Blackcat affiliates have compromised over 1000 entities—nearly 75 percent of which are in the United States and approximately 250 outside the United States—, demanded over $500 million, and received nearly $300 million in ransom payments."[38]

e.   "ALPHV Blackcat affiliates use advanced social engineering techniques and open source research on a company to gain initial access."[39]

f.   "Some ALPHV Blackcat affiliates exfiltrate data after gaining access and extort victims without deploying ransomware. After exfiltrating and/or encrypting data, ALPHV Blackcat affiliates communicate with victims via TOR, Tox, email, or encrypted applications."[40]

39.   And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[41]

40.   Thus, on information and belief, Plaintiff's and the Class's stolen PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

***Plaintiff's Experiences and Injuries***

41.   Plaintiff Seth Khaner is a current customer of Prudential —having purchased life insurance.

---

[38] *Id*.
[39] *Id*.
[40] *Id*.
[41] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

42.    Plaintiff received a Notice of Data Breach.

43.    As a condition of receiving financial products and/or services from Prudential Plaintiff provided Prudential with his PII/PHI. Prudential used that PII/PHI to facilitate its provision of financial products and/or services.

44.    Prudential maintained and generated Plaintiff's PII/PHI in the course of providing insurance services to Plaintiff.

45.

46.    Plaintiff provided his PII/PHI to Prudential and trusted the company would use reasonable measures to protect it according to Prudential's internal policies, as well as state and federal law. Prudential obtained and continues to maintain Plaintiff's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

47.    Plaintiff reasonably understood that a portion of the funds paid to Prudential would be used to pay for adequate cybersecurity and protection of PII/PHI.

48.    Had Prudential disclosed that it disregarded its duty to safeguard and protect Plaintiff's PII/PHI from unauthorized access, Plaintiff would have taken that into account in making his insurance decisions. In particular, had Plaintiff known about Prudential's failure to reasonably or adequately secure, safeguard, and otherwise protect Plaintiff's PII/PHI, he would not have provided his PII/PHI to Prudential and would have engaged a competing provider to obtain life insurance.

49.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

50.    Critically, Plaintiff was warned by Chase that his PII/PHI was found **published** on the Dark Web. The impact of this exposure is readily apparent.

51.    And the dissemination of his PII/PHI on the Dark Web is underscored by the following:

     a.    Plaintiff's account with the retailer "Kohl's" was locked due to suspicious activity on July 4, 2024;

     b.    Plaintiff's account with "Booking.com" has been subjected to numerous fraudulent login attempts; and

     c.    Plaintiff has suffered from a sharp increase in invasive spam and scam messages.

52.    Thereafter, Plaintiff was forced to spend **several hours** placing "locks" on his credit—in an attempt to guard against further injuries.

53.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

54.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

55.    Plaintiff suffered actual injury from the exposure and theft of his PII/PHI—which violates his rights to privacy.

56.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

57.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII/PHI right in the hands of criminals.

58.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

59.    Today, Plaintiff has a continuing interest in ensuring that his PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

60.    Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

   a.    loss of the opportunity to control how their PII/PHI is used;

   b.    diminution in value of their PII/PHI;

   c.    compromise and continuing publication of their PII/PHI;

   d.    out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

   e.    lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

   f.    delay in receipt of tax refund monies;

   g.    unauthorized use of their stolen PII/PHI; and

        h.    continued risk to their PII/PHI—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII/PHI.

61.    Stolen PII/PHI is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII/PHI can be worth up to $1,000.00 depending on the type of information obtained.

62.    The value of Plaintiff and Class's PII/PHI on the black market is considerable. Stolen PII/PHI trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

63.    It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII/PHI far and wide.

64.    One way that criminals profit from stolen PII/PHI is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data— first the stolen PII/PHI, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

65.    The development of "Fullz" packages means that the PII/PHI exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

66.    In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII/PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class members, and it is reasonable for any trier of fact, including this

Court or a jury, to find that Plaintiff and other Class members' stolen PII/PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

67.    Defendant disclosed the PII/PHI of Plaintiff and Class members for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII/PHI of Plaintiff and Class members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII/PHI.

68.    Defendant's failure to promptly and properly notify Plaintiff and Class members of the Data Breach exacerbated Plaintiff and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

69.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

70.    In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records—a 68% increase from 2020.[42]

71.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have

---

[42]  *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.

lesser IT defenses and a high incentive to regain access to their data quickly."[43]

72.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

**Defendant Failed to Follow FTC Guidelines**

73.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

74.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[44]  The FTC declared that, *inter alia*, businesses must:

> a.    protect the personal customer information that they keep;
>
> b.    properly dispose of personal information that is no longer needed;
>
> c.    encrypt information stored on computer networks;
>
> d.    understand their network's vulnerabilities; and
>
> e.    implement policies to correct security problems.

75.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

76.    Furthermore, the FTC explains that companies must:

---

[43] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[44] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

a.    not maintain information longer than is needed to authorize a transaction;

b.    limit access to sensitive data;

c.    require complex passwords to be used on networks;

d.    use industry-tested methods for security;

e.    monitor for suspicious activity on the network; and

f.    verify that third-party service providers use reasonable security measures.

77.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

78.    In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former customers' (and their beneficiaries') data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

79.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

80.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email

management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

81.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

82.     These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

***Defendant Violated HIPAA***

83.     HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[45]

---

[45] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

84.      HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII/PHI and PHI is properly maintained.[46]

85.      The Data Breach itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

a.      failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b.      failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c.      failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d.      failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e.      failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to

---

[46] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.      failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.      failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.      failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.      failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

86.      Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations.

**CLASS ACTION ALLEGATIONS**

87.      Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following Class:

> All individuals residing in the United States whose PII/PHI was compromised in the Data Breach discovered by Prudential in February 2024, including all those individuals who received notice of the breach.

88.     Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

89.     Plaintiff reserves the right to amend the class definition.

90.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

91.     <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

92.     <u>Numerosity</u>. The Class members are so numerous that joinder of all Class members is impracticable. Upon information and belief, the proposed Class includes at least 2,556,210 members.

93.     <u>Typicality</u>. Plaintiff's claims are typical of Class members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

94.     <u>Adequacy</u>. Plaintiff will fairly and adequately protect the proposed Class's common interests. Her interests do not conflict with Class members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

95.     <u>Commonality and Predominance</u>. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting

individual Class members—for which a class wide proceeding can answer for all Class members. In fact, a class wide proceeding is necessary to answer the following questions:

    a.    if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII/PHI;

    b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.    if Defendant were negligent in maintaining, protecting, and securing PII/PHI;

    d.    if Defendant breached contract promises to safeguard Plaintiff and the Class's PII/PHI;

    e.    if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

    f.    if Defendant's Breach Notice was reasonable;

    g.    if the Data Breach caused Plaintiff and the Class injuries;

    h.    what the proper damages measure is; and

    i.    if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

96.    Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class members, on an individual basis, to obtain effective redress for

their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff and the Class)

97.     Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

98.     Plaintiff and the Class (or their third-party agents) entrusted their PII/PHI to Defendant on the premise and with the understanding that Defendant would safeguard their PII/PHI, use their PII/PHI for business purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

99.     Defendant owed a duty of care to Plaintiff and Class members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

100.     Defendant has full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiff and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

101.     Defendant owed these duties to Plaintiff and Class members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class members' PII/PHI.

102.    Defendant owed—to Plaintiff and Class members—at least the following duties to:

a.    exercise reasonable care in handling and using the PII/PHI in its care and custody;

b.    implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c.    promptly detect attempts at unauthorized access;

d.    notify Plaintiff and Class members within a reasonable timeframe of any breach to the security of their PII/PHI.

103.    Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

104.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

105.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

106.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Defendant with their confidential PII/PHI, a necessary part of obtaining services from Defendant.

107.    The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Defendant hold vast amounts of PII/PHI, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII/PHI —whether by malware or otherwise.

108.    PII/PHI is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiff and Class members' and the importance of exercising reasonable care in handling it.

109.    Defendant improperly and inadequately safeguarded the PII/PHI of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

110.    Defendant breached these duties as evidenced by the Data Breach.

111.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class members' PII/PHI by:

a.    disclosing and providing access to this information to third parties and

b.    failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

112.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII/PHI of Plaintiff and Class members which actually and proximately caused the Data Breach and Plaintiff and Class members' injury.

113.    Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class members' injuries-in-fact.

114.    Defendant has admitted that the PII/PHI of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

115.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

116.    And, on information and belief, Plaintiff's PII/PHI has already been published— or will be published imminently—by cybercriminals on the Dark Web.

117.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by criminals, improper disclosure of their PII/PHI, lost benefit of their bargain, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

### SECOND CAUSE OF ACTION
**Negligence *per se***
**(On Behalf of Plaintiff and the Class)**

118.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

119.    Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class members' PII/PHI.

120.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII/PHI entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class members' sensitive PII/PHI.

121.    Defendant breached its respective duties to Plaintiff and Class members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII/PHI.

122.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

123.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

124.    But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class members would not have been injured.

125.    The injury and harm suffered by Plaintiff and Class members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known

that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII/PHI.

126.    Similarly, under HIPAA, Defendant had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiff's and Class members' PHI.

127.    Defendant violated its duty under HIPAA by failing to use reasonable measures to protect its PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendant's conduct was particularly unreasonable given the nature and amount of PHI that Defendant collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

128.    Defendant's various violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

129.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

<u>**THIRD CAUSE OF ACTION**</u>
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

130.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

131.    Plaintiff and Class members either directly contracted with Defendant or Plaintiff and Class members were the third-party beneficiaries of contracts with Defendant.

132.    Plaintiff and Class members (or their third-party agents) were required to provide their PII/PHI to Defendant as a condition of receiving products and/or services provided by Defendant. Plaintiff and Class members (or their third-party agents) provided their PII/PHI to Defendant or its third-party agents in exchange for Defendant's products and/or services.

133.     Plaintiff and Class members (or their third-party agents) reasonably understood that a portion of the funds they paid Defendant would be used to pay for adequate cybersecurity measures.

134.     Plaintiff and Class members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

135.     Plaintiff and the Class members (or their third-party agents) accepted Defendant's offers by disclosing their PII/PHI to Defendant or its third-party agents in exchange for products and/or services.

136.     In turn, and through internal policies, Defendant agreed to protect and not disclose the PII/PHI to unauthorized persons.

137.     In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiff's and Class Member's PII/PHI.

138.     Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII/PHI.

139.     After all, Plaintiff and Class members (or their third-party agents) would not have entrusted their PII/PHI to Defendant (or their third-party agents) in the absence of such an agreement with Defendant.

140.     Plaintiff and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendant.

141.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

142.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

143.    Defendant materially breached the contracts it entered with Plaintiff and Class members (or their third-party agents) by:

  a. failing to safeguard their information;

  b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

  c. failing to comply with industry standards;

  d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

  e. failing to ensure the confidentiality and integrity of the electronic PII/PHI that Defendant created, received, maintained, and transmitted.

144.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

145.    Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class members' injuries (as detailed *supra*).

146.    And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

147.    Plaintiff and Class members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

## FOURTH CAUSE OF ACTION
### Invasion of Privacy
### (On Behalf of Plaintiff and the Class)

148.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

149.    Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

150.    Defendant owed a duty to its current and former customers (and their beneficiaries), including Plaintiff and the Class, to keep this information confidential.

151.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class members' PII/PHI is highly offensive to a reasonable person.

152.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

153.    The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

154.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

155.    Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

156.    Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

157.    As a proximate result of Defendant's acts and omissions, the private and sensitive PII/PHI of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

158.    And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

159.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII/PHI are still maintained by Defendant with their inadequate cybersecurity system and policies.

160.    Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII/PHI of Plaintiff and the Class.

161.    In addition to injunctive relief, Plaintiff, on behalf of himself and the other Class members, also seeks compensatory damages for Defendant's invasion of privacy, which includes

the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

### FIFTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

162.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

163.    This claim is pleaded in the alternative to the breach of implied contract claim.

164.    Plaintiff and Class members (or their third-party agents) conferred a benefit upon Defendant. After all, Defendant benefitted from using their PII/PHI to provide products and/or services.

165.    Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class members (or their third-party agents).

166.    Plaintiff and Class members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

167.    Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class members' PII/PHI.

168.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

169.    Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and Class members' products and/or services because Defendant failed to adequately protect their PII/PHI.

170.    Plaintiff and Class members have no adequate remedy at law.

171.    Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Class)

172.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

173.    Given the relationship between Defendant and Plaintiff and Class members, where Defendant became guardian of Plaintiff's and Class members' PII/PHI, Defendant became a fiduciary by its undertaking and guardianship of the PII/PHI, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff and Class members' PII/PHI; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

174.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their PII/PHI.

175.    Because of the highly sensitive nature of the PII/PHI, Plaintiff and Class members (or their third-party agents) would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII/PHI had they known the reality of Defendant's inadequate data security practices.

176.    Defendant breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII/PHI.

177.    Defendant also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

178.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

### SEVENTH CAUSE OF ACTION
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

179.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

180.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

181.    In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

182.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.    Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b.      Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c.      Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d.      Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiff and Class members.

183.    The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

184.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

185.    And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class members' injuries.

186.    If an injunction is not issued, the resulting hardship to Plaintiff and Class members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

187.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class members, and the public at large.

## PRAYER FOR RELIEF

Plaintiff and Class members respectfully request judgment against Defendant and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C.    Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D.    Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E.    Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

F.    Awarding attorneys' fees and costs, as allowed by law;

G.    Awarding prejudgment and post-judgment interest, as provided by law;

H.    Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.    Granting other relief that this Court finds appropriate.

### JURY DEMAND

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury for all issues triable by jury.

Dated: July 10, 2024                    Respectfully submitted,

By: */s/ Christopher L. Ayers*
**SEEGER WEISS LLP**
Christopher A. Seeger
Christopher L. Ayers
Hillary Fidler

55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
Telephone: (973) 639-9100
Facsimile: (973) 639-9393
cseeger@seegerweiss.com
cayers@seegerweiss.com
hfidler@seegerweiss.com

J. Gerard Stranch IV*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
T: (615) 254–8801
gstranch@stranchlaw.com

*Pro hac vice forthcoming*
*Attorneys for Plaintiff and Proposed Class*